COKE v. ILLINOIS CENT. R. CO. et al.

(District Court, W. D. Tennessee, W. D. January 17, 1919.)

No. 1784.

1. STATUTES ⬤═══217—CONSTRUCTION—HISTORY AND PASSAGE.

Where acts of Congress are ambiguous, the courts may properly have recourse to public documents and proceedings in Congress pending consideration of the legislation and to contemporaneous events and the existing situation.

2. EVIDENCE ⬤═══28—JUDICIAL NOTICE—LABOR BODIES WHICH URGED ADAMSON LAW.

It is matter of common knowledge that the Adamson Law Sept. 3, 5, 1916 (Comp. St. §§ 8680a–8680d), was enacted at instance of four bodies of organized railway employés, the Order of Conductors, Brotherhood of

⬤═══For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

Engineers, Brotherhood of Firemen and Engineers, and Brotherhood of Trainmen.

3. MASTER AND SERVANT ⬅=⏵13—RAILROAD EMPLOYMENT—ADAMSON LAW—NONAPPLICATION TO SWITCH TENDER.

The Adamson Law Sept. 3, 5, 1916 (Comp. St. §§ 8680a–8680d), making eight hours the standard of a day's work to reckon compensation of railroad employés, *held* to apply only to employés doing work performed by four railroad labor brotherhoods to prevent whose strike statute was enacted, that is, all trainmen working on engines and in cars, not to switch tender in yards of railroads.

At Law. Action by H. P. Coke against the Illinois Central Railroad Company and the Yazoo & Mississippi Valley Railroad Company. Order directed to be entered effectuating the agreement made at hearing.

Anderson & Crabtree, of Memphis, Tenn., for plaintiff.
Chas. N. Burch, of Memphis, Tenn., for defendants.

McCALL, District Judge. This is an action brought by H. P. Coke against the Illinois Central and Yazoo & Mississippi Valley Railroad Companies to recover additional compensation in the sum of $274 for services as a switch tender rendered the defendants at the Grand Central Station, Memphis, Tenn., from January 1 to August 17, 1917. It is alleged that plaintiff was actually engaged as a switch tender in the operation of interstate trains of defendants at a compensation of $75 per month, that he worked twelve hours per day, and that by virtue of the Act of Congress approved September 3 and 5, 1916, c. 436, 39 Stat. 721 (Comp. St. §§ 8680a–8680d), commonly known as the Adamson Law, he is entitled to be paid on an eight hour per day basis of compensation. The act provides that—

"Beginning January 1st, 1917, eight hours shall, in contracts for labor and service, be deemed a day's work and the measure or standard of a day's work for the purpose of reckoning the compensation for services of all employés who are now or may hereafter be employed by any common carrier by railroad * * * and who are now or may hereafter be actually engaged in any capacity in the operation of trains used for the transportation of persons or property on railroads. * * *"

The other provisions of the act are not material here.

There is no material controversy about the facts. The only question for decision is whether the plaintiff belongs to that class of railroad employés at whose instance and for whose benefit the Adamson Law was enacted. In other words, was the plaintiff "actually engaged in any capacity in the operation of trains used for the transportation of persons or property" within the scope, intention, and meaning of the act?

Broadly speaking, the act might be construed to include every employé of such railroad from president down to section hand, who was in any capacity actually engaged in doing those things necessary to the operation of trains; such as directing their operation in a supervising way, maintaining the roadway, lining up switches for their operation, or aboard the trains manually operating them, etc.

The undisputed evidence is that the work plaintiff did, to wit, lining up switches, is the work some member of the train crew would do but for the switch tender; the switch tender being employed to line up switches in order to obviate the necessity of stopping a train to permit a member of the train crew to alight therefrom and line up the switch. And it is insisted that, if a member of a train crew alights from his train to line up a switch for his train to pass, he would be actually engaged in operating a train, and hence a switch tender, employed to do and doing only this particular work in order to relieve a member of the train crew from such duty, would also be actually engaged in operating a train in some capacity, within the meaning of the statute.

In the interest of clearness it may be well to state in more detail the work plaintiff did. In defendants' terminals, a short distance from the passenger station, is maintained a switch over which all their trains entering or leaving the station pass. From this switch parallel tracks numbered from 1 to 10 lead into the station shed. Each train entering the shed is regularly assigned to come in over a particular track, and always does so except when late or for some other unexpected cause. In such event, the yardmaster informs the switch tender which track the train should occupy, and he lines up the switch so as to comply with this order. Trains leaving the shed for their trips over the road pass over the switch which is lined up so as the train passes onto the main line over which it makes its trip. In other words, the switch tender by lining up the switch throws the incoming train onto the proper main line, or onto a switch line which leads to the outgoing main line.

[1] Assuming, but not deciding, that plaintiff was actually engaged in some capacity in operation of trains, the question arises: Did Congress intend by the Adamson Act to include and provide for employés engaged in the work plaintiff was doing? It is too much to say that the terms of the act are clear and unambiguous. In such circumstance it is well settled that in determining the scope, intention, and meaning of acts of Congress, to give effect to them courts may properly have recourse to public documents and proceedings in Congress had pending the consideration of the piece of legislation in question, and may also properly look at contemporaneous events, the situation as it existed, and as it was pressed upon the attention of the legislative body. Johnson v. S. P. Co., 196 U. S. 1, 25 Sup. Ct. 158, 49 L. Ed. 363; Standard Oil Co. v. U. S., 221 U. S. 1, 31 Sup. Ct. 502, 55 L. Ed. 619, 34 L. R. A. (N. S.) 834, Ann. Cas. 1912D, 734; Binns v. U. S., 194 U. S. 486, 24 Sup. Ct. 816, 48 L. Ed. 1087; Lapina v. Williams, 232 U. S. 78, 34 Sup. Ct. 196, 58 L. Ed. 515; Holy Trinity Church v. U. S., 143 U. S. 457, 12 Sup. Ct. 511, 36 L. Ed. 226.

[2] In view of these authorities, the court feels warranted in saying that it is of common knowledge derived from the message of the President pressing the prompt enactment of the law in question, delivered orally to the Congress, from the Congressional Record, as well as from all the great newspapers and periodicals of the day, that

the Adamson Law was enacted at the instance of four bodies of organized railway employés, to wit, Order of Railway Conductors, Brotherhood of Locomotive Engineers, Brotherhood of Locomotive Firemen and Engineers, and Brotherhood of Railway Trainmen. The members of these four organizations were all employés whose duties were discharged aboard railway trains, such as conductors, engineers, firemen, and railway trainmen, which latter term would include all those whose duties were performed "on the engines and in the cars." While it was thought by the four brotherhoods mentioned that the legislation provided for their best interest, and they demanded it, yet it is fair to say, judging from the Congressional Record, that it was enacted by Congress primarily to prevent a calamity to the country which was thought sure to follow in case it was not enacted, if the brotherhoods, in case it was not enacted, should carry into effect their declared purpose to call a strike, and thus stop trains moving in interstate commerce and tie up the commercial interests of the country.

As was said by the President to the Congress (page 13361, Congressional Record of August 29, 1916):

"The four hundred thousand men from whom the demands proceeded had voted to strike if their demands were refused; the strike was imminent; it has since been set for the fourth of September next. It affects the men who man the freight trains on practically every railway in the country. The freight service throughout the United States must stand still until their places are filled, if, indeed, it should prove possible to fill them all. Cities will be cut off from their food supplies, the whole commerce of the nation will be paralyzed, men of every sort and occupation will be thrown out of employment, countless thousands will in all likelihood be brought, it may be, to the very point of starvation, and a tragical national calamity brought on, to be added to the other distresses of the time, because no basis of accommodation or settlement has been found."

To avert the direful calamity so vividly pictured by the President, Congress without investigation, and without time for investigation, enacted the Adamson Law.

Senator Underwood, who was in charge of the bill during its consideration, said:

"They are not contending for an eight hour day, that a man shall work only eight hours; they do not want that. They work by piecemeal on the engines and in the cars. The bill, however, is only temporary. The only justification for us passing this bill at this time and in this haste, without our knowledge and without consideration, is the fact that we are doing it to meet a very great emergency to the American people. We are not passing this bill in the interest of the trainmen, but we are passing it in the interest of the American people, if we pass it right and properly."

And, further, in answer to a question by Senator Borah as to whether it would cover "trainmen and switchmen," Senator Underwood replied:

"I do not think that the bill would, but I will say that I have not given careful consideration to that portion of the bill, because that part of it is temporary. Section 6 if put into life will cover without discrimination every man who works for a railroad." Congressional Record, Sept. 1, 1916, p. 15558.

Section 6 was not "put into life," and from the remarks of Senator Underwood it is but reasonable to conclude that he and the Congress

255 F.—13

understood that the law applied only to those who actually operated the trains as parts of their crews.

But over and beyond this, the validity of the act was before the Supreme Court of the United States in Wilson v. New, 243 U. S. 332, 37 Sup. Ct. 298, 61 L. Ed. 755, L. R. A. 1917E, 938, Ann. Cas. 1918A, 1024, wherein it was held to be constitutional. The point was made in that case that the act was void for unlawful inequality and arbitrary classification, in that it included only employés actually engaged in the operation of trains, and did not include other railroad employés. The Supreme Court sustained the classification on the ground that only those actually engaged in the operation of trains (not including switchmen) were threatening to strike, and that it was therefore proper to pass legislation which affected only those who were so threatening, apparently meaning thereby to say that the legislation applied only to the Order of Railway Conductors, Brotherhood of Locomotive Engineers, Brotherhood of Locomotive Firemen and Engineers, and Brotherhood of Railway Trainmen.

In discussing this phase of the case, the Supreme Court said:

"The want of equality is based upon two considerations. The one is the exemption of certain short line and electric railroads. We dismiss it because it has been adversely disposed of by many previous decisions. The second rests upon the charge that unlawful inequality results because the statute deals, not with all, but only with the wages of employés engaged in the movement of trains. *But such employés were those concerning whom the dispute as to wages existed, growing out of which the threat of interruption of interstate commerce arose, a consideration which establishes an adequate basis for the statutory classification.*" (Italics mine.)

[3] Clearly the Adamson Law does not apply to all employés of railroads engaged in interstate commerce, nor does it apply to all those who are actually engaged in doing some of the things necessary for the operation of trains. It would seem, therefore, reasonable and proper to follow the line of cleavage which the Congress intended to establish, as gathered from the contemporaneous history of events attending the consideration and passage of the law. When the act is thus considered in the light of the utterances of the President, the Congressional Record, the hearings before the Committee on Interstate Commerce, and the report of the Wage Commission, it appears that Congress was dealing with the four brotherhoods only, and intended the legislation to apply only to those doing the work performed by the brotherhoods. That is to say, to trainmen who worked "on the engines and in the cars." This conclusion is greatly strengthened by the language of the Supreme Court of the United States in Wilson v. New, supra.

These considerations lead to the conclusion that, the act must be limited to those actually engaged in operating trains as trainmen. Since it does not appear that the class of railroad employés to which plaintiff belongs was one of the four brotherhoods at whose request, insistence, and supposed benefit the Adamson Law was enacted, or that plaintiff worked "on the engine or in the cars," and it appearing that his work was in the yards as a switch tender, it follows that in my judgment he is not entitled to the relief sought.

It was agreed at the hearing that the verdict of the jury and judgment of the court in this case should be made to turn upon the decision of the law question herein disposed of. Such order will be entered as will properly carry into effect that agreement.